## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-CIV-60784-RAR

**BRYAN ALEXANDER**
**CORONA MATOS,** *et al.*,

      Petitioners,

v.

**JUAN A. LOPEZ VEGA,** *in his official*
*capacity as Assistant Field Office Director,*
*ICE Officer in Charge of Broward Transitional*
*Center, et al.*,

      Respondents.

_____/

### ORDER DENYING EMERGENCY PETITION FOR
### WRIT OF HABEAS CORPUS AND INJUNCTIVE RELIEF

This case addresses a federal court's ability to exercise equitable relief by immediately releasing civil detainees in our immigration system given the COVID-19 pandemic. It serves as an important reminder that although a federal court's power to grant equitable relief when faced with a purported constitutional violation is far-reaching, it is not limitless. Such power must yield to binding precedent and cannot be used to improperly interfere with Executive and agency policymaking.

Having considered the Emergency Petition for Writ of Habeas Corpus [ECF No. 1] ("Petition"), Respondents' Response to the Petition [ECF No. 18] ("Response"), Petitioners' Reply in Support of the Petition [ECF No. 22], and the arguments raised at the hearing on April 30, 2020 ("Hearing"), it is hereby

**ORDERED AND ADJUDGED** that the Petition [ECF No. 1] is **DENIED** for the reasons set forth herein.

## BACKGROUND

### A. The COVID-19 Virus

The President of the United States has declared a national state of emergency due to a high severity pandemic that has impacted the entire world.[1] The Centers for Disease Control and Prevention ("CDC") report that there are over one million documented cases of COVID-19 in the United States, amounting to over 65,000 deaths in 55 jurisdictions.[2] It is likely that the total amount of cases is even higher than reported, given the well-documented shortage of testing for COVID-19.[3] Simply put, the impact and scourge of this virus cannot be understated.

COVID-19 is mainly spread person to person through "respiratory droplets produced when an infected person coughs or sneezes."[4] However, there is evidence of asymptomatic transmission.[5] Spread is more likely when people are in close contact and approximately within six feet of one another.[6]

---

[1] *Presidential Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[2] *Cases of Coronavirus Disease (COVID-19) in the U.S.*, CENTERS FOR DISEASE CONTROL & PREVENTION (May 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html?fbclid=IwAR2YGdSiJ1zk6mktakCLsCqjU-tEq9XsvLMK2fGG0vmHPIsAdMgl8C13cOU.

[3] *See* David Lim, *Coronavirus Testing Hits Dramatic Slowdown*, POLITICO (Apr. 14, 2020), https://www.politico.com/news/2020/04/14/coronavirus-testing-delays-186883; Caitlin Owens, *Diagnostic Testing Supply Shortages Threaten Coronavirus Response*, AXIOS (Apr. 13, 2020), https://axios.com/diagnostic-testing-shortages-coronavirus-6a-6aea12b3-98e8-407d-aa7d-717eecdce156.html; *see also* Mark McClellan, Scott Gottlieb, Farzad Mostashari, Caitlin Rivers, & Lauren Silvis, *A National COVID-19 Surveillance System: Achieving Containment*, DUKE UNIV. MARGOLIS CTR. FOR HEALTH POLICY (Apr. 7, 2020), https://healthpolicy.duke.edu/sites/default/files/atoms/files/covid19_surveillance_roadmap_final.pdf.

[4] *Frequently Asked Questions: How COVID-19 Spreads*, CENTERS FOR DISEASE CONTROL & PREVENTION (Apr. 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Coronavirus-Disease-2019-Basics.

[5] *Id.*; *see also* Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, THE NEW YORK TIMES (Apr. 1, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[6] *Frequently Asked Questions: How COVID-19 Spreads*, CENTERS FOR DISEASE CONTROL & PREVENTION (Apr. 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Coronavirus-Disease-2019-Basics.

Symptoms of COVID-19 include fever, cough, shortness of breath, muscle aches, loss of smell and/or taste, and typically appear between two to fourteen days after exposure.[7]  These symptoms may cause mild illnesses or fatalities, often (but not always) depending on age and underlying health conditions.[8]  Adults over the age of 65 and persons with "serious underlying medical conditions," such as "chronic lung disease," "moderate to severe asthma," and diabetes are considered "high-risk" for severe illness from COVID-19.[9]  There is currently no vaccine or cure for the virus.[10]

Because detainees and prisoners often congregate near one another to complete basic, essential tasks, the CDC has promulgated guidelines to manage the spread of COVID-19 in detention centers and other correctional facilities.  *See* CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-2019) [ECF No. 1-9] ("CDC Guidelines").  United States Immigration and Customs Enforcement ("ICE") has set forth its own policy guidelines in consultation with the CDC.  *See* ICE's Enforcement and Removal Operations COVID-19 Pandemic Response Requirements [ECF No. 1-10] ("ICE Guidelines").  ICE Guidelines require all detention centers housing ICE detainees to comply with certain safety measures, such as providing detainees and staff "unlimited" access to supplies for hand cleaning, reducing the population to approximately 75% capacity, maintaining a distance of six feet between detainees "whenever possible," and rearranging housing units to allow for sufficient separation "if practicable."  *Id.* at 9, 13.

---

[7]  *Frequently Asked Questions: How COVID-19 Spreads & Symptoms & Testing*, CENTERS FOR DISEASE CONTROL & PREVENTION (Apr. 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Coronavirus-Disease-2019-Basics.

[8]  *Id.*

[9]  *Id.*

[10]  *Prevent Getting Sick: How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (May 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

### B. The Broward Transitional Center

The Broward Transitional Center ("BTC") is an immigration detention center in Pompano Beach, Florida. The GEO Group, a private contracted company, runs the day-to-day operations of BTC, and the GEO Medical Department provides "direct medical, dental, and mental health services" to BTC detainees. Decl. Juan A. Lopez Vega [ECF No. 18-1] ("Lopez Vega Decl.") ¶ 3. It is the responsibility of ICE Health Services and its assigned Field Medical Coordinators to ensure the GEO Medical Department complies with proper medical standards. *Id.* at ¶¶ 3-4.

To comply with ICE Guidelines, BTC ensures all new intakes are assessed for fevers, respiratory illnesses, and whether they were knowingly in contact with someone who tested positive for COVID-19 or traveled through areas with sustained community transmission within twelve hours of their arrival. *Id.* at ¶ 9. In the event a detainee presents symptoms compatible with COVID-19, the detainee is "immediately" transported to Broward Health North for further evaluation and testing. *Id.* at ¶ 10. In cases where a detainee is asymptomatic and confirms he or she was exposed to a person with COVID-19, the detainee is "placed in cohorts[11] with restricted movement for the duration of the most recent incubation period . . . and are monitored twice daily for fever and symptoms of respiratory illness."[12] *Id.* at ¶ 11.

Additionally, new detainee groups who have already been exposed to one another are "kept together and not co-mingled with the general population for the first fourteen days [of their] arrival to the facility." *Id.* These groups have designated recreation time and telephone time separate from the general population. *Id.* Nursing staff also evaluates their body temperature and overall health at least twice a day. *Id.* These detainees are also educated on how to access the medical

---

[11]  "Cohorting is an infection-prevention strategy which involves housing detainees together who were exposed to a person with an infectious organism but are asymptomatic." Lopez Vega Decl. ¶ 11.

[12]  "Ideally, [confirmed] cases should be isolated individually, and close contacts should be quarantined individually. However, some correctional facilities and detention centers do not have enough individual cells to do so and must consider cohorting as an alternative." CDC Guidelines at 3.

department and are strongly encouraged to report "*any and all*" symptoms to medical personnel. *Id.* at ¶ 20 (emphasis in original).

BTC is screening all GEO and ICE staff members when they enter the building, including taking body temperatures. *Id.* at ¶ 17. "All staff members are *required* to wear personal protective equipment ("PPE") [and] [a]ll staff members have access to gloves that are located throughout the facility."[13] *Id.* at ¶ 18 (emphasis added). All staff is provided with hand sanitizer upon entering the facility and throughout the facility. *Id.* at ¶ 15.

With respect to medical services, BTC "provides daily access to sick calls in a clinical setting, and has an onsite medical observation room, pharmacy, tele-psychiatry and access to 24/7 specialty services and hospital care within the community." *Id.* at ¶ 12. Additionally, BTC has contracts with "several local hospitals" with readily available resources to "meet the needs of the facility and detainee population, if needed." *Id.* Signs are posted throughout the facility in both English and Spanish to inform detainees of the virus and its symptoms. *Id.* at ¶ 20. And BTC also provides educational materials to detainees to stress the importance of good hygiene (i.e., hand washing, covering coughs with elbows, sleeping in head-to-toe position, etc.). *Id.*

To limit the possible spread of COVID-19, "[d]etainees are provided with hand sanitizer upon entering the dining hall and medical [department,]" and "antibacterial soap is available and provided to all detainees in every housing unit."[14] *Id.* at ¶ 15. BTC also provides "disinfectant spray to cleaning crews and detainees" to sanitize the facility. *Id.*; *see also* Decl. Rosmary Freites Panté Del Valle [ECF No. 1-13] ("Rosmary Decl.") ¶ 37.

---

[13]  According to Petitioners, on March 18, 2020, a staff attorney visited BTC and did not witness any guards or detainees wearing masks. *See* Decl. Maya Weissman Fabra [ECF No. 1-12] ¶ 5. Notably, the ICE Guidelines were created on April 10, 2020. *See generally* ICE Guidelines. Therefore, it is likely that circumstances have since changed given the new ICE Guidelines, as well as the issuance of several court orders requiring improvements to the facility and the now two-month disparity.

[14]  Petitioners dispute the extent to which detainees are provided with antibacterial soap and/or hand sanitizer. *See* Decl. Rosmary Freites Panté Del Valle [ECF No. 1-13] ¶¶ 38-39.

In an effort to facilitate social distancing, BTC has released "all detainees 60 years of age and older." Lopez Vega Decl. ¶ 21. As of April 29, 2020, the detention population has been reduced by 37%. *See* Supplemental Decl. Juan Lopez Vega [ECF No. 23-1] ("Supp. Lopez Vega Decl.") ¶ 14. BTC has also limited the number of detainees permitted to eat in the cafeteria at any one time and blocked off every other seat in the cafeteria so detainees are unable to sit next to one another.[15] *See* Rosmary Decl. ¶¶ 33-34. Staff members, such as ICE Deportation Officers, are also teleworking whenever possible. *See* Decl. Maya Weissman Fabra [ECF No. 1-12] ("Fabra Decl.") ¶ 11. Moreover, "GEO and ICE regularly share information on detainees who may be at high risk for COVID-19 and have chronic conditions" and after "considering the detainee's health, public safety, and mandatory detention requirements," ICE determines whether release is appropriate. Lopez Vega Decl. ¶ 21.

Most significantly, as of April 29, 2020, there are "zero suspected cases of COVID-19" and "zero confirmed cases of COVID-19" at BTC, including staff and detainees. Suppl. Lopez Vega Decl. ¶ 13. There are also "zero detainees cohorted for exhibiting symptoms of COVID-19." *Id.* And in the event BTC needs to test a detainee with symptoms suggesting COVID-19, BTC has test kits "on site and readily available." *Id.*[16]

### C. *Petitioners*

Petitioner Bryan Alexander Corona Matos is a 20-year-old Cuban citizen with a history of asthma categorized as "mild persistent." *Id.* at ¶ 24; Petition ¶ 17. He was denied bond during his removal proceedings because he was deemed a flight risk. Petition ¶ 64. As of February 24, 2020,

---

[15] Petitioners claim this limitation exposes detainees to even more risk because they are required to wait in line to enter the cafeteria and the limited space does not provide for a six-foot distance between each detainee. *See* Rosmary Decl. ¶ 34.

[16] As part of the alleged inadequacies of BTC, Petitioners note that BTC is not regularly testing new intakes, detainees already in custody, or their staff. *See* Fabra Decl. ¶¶ 10, 13.

Petitioner Corona Matos has a final order of removal.  *Suppl. Lopez Vega Decl.* ¶ 23.  He is scheduled to return to Cuba sometime during the week of May 6, 2020.  *Id.*[17]

Petitioner Maikel Alberto Betancourt Redmond is a 37-year-old Cuban citizen with a history of hypertension categorized as "labile."  *Id.* at ¶¶ 26-27; Petition ¶ 18.  He was also denied bond during his removal proceedings.  Petition ¶ 81.  As of February 8, 2020, Petitioner Redmond has a final order of removal.  *Suppl. Lopez Vega Decl.* ¶ 26.  He is scheduled to return to Cuba sometime during the week of May 6, 2020.  *Id.*

Petitioner Zakir Hossain is a 31-year-old citizen of Bangladesh with a history of hypertension and high cholesterol.  *Id.* at ¶¶ 30-31; Petition ¶ 19.  As of November 17, 2016, Petitioner Hossain has a final order of removal.  *Suppl. Lopez Vega Decl.* ¶ 30.  Petitioner Hossain was detained by ICE on January 15, 2020 as part of a fugitive operation.  *Id.*  He is scheduled to return to Bangladesh sometime during the week of May 24, 2020.  *Id.* at ¶ 32.

Petitioner Ismael Reyes Otero is a 25-year-old Cuban citizen with an alleged history of asthma.  *Id.* at ¶ 33; Petition ¶ 20.  After entering the United States, Petitioner Reyes Otero was placed in U.S. Marshall custody and charged with "attempted illegal entry by eluding an immigration officer."  Petition ¶ 112.  He pleaded guilty and was sentenced to time served.  *Id.*  Petitioner Reyes Otero has been in custody since entering the United States.  *Id.* at ¶ 111.  Upon arriving at BTC, Petitioner Reyes Otero did not have a chronic medical history.  *Suppl. Lopez Vega Decl.* ¶ 34.  Petitioner Reyes Otero also "denied any chronic medical issues during intake questioning."  *Id.*  A registered nurse performed a physical examination of Petitioner Reyes Otero, including taking his vital signs, and all findings were within normal limits.  *Id.*  He also underwent an x-ray on intake and his results were negative for "acute cardiopulmonary disease,

---

[17] It is likely the declarant intended to state the "week of May 3, 2020."

communicable disease, or active tuberculosis." *Id.* As of February 20, 2020, Petitioner Reyes Otero has a final order of removal. *Id.* at ¶ 33. He is scheduled to return to Cuba sometime during the week of May 6, 2020. *Id.*

Each Petitioner is currently detained at BTC under 8 U.S.C. section 1231. *Id.* at ¶¶ 23, 26, 30, 33. Pursuant to a court order issued on April 20, 2020, ICE conducted a custody determination as to each Petitioner.[18] *Id.* at ¶¶ 25, 28, 32, 34. After reviewing their custody arrangements, ICE determined to keep Petitioners in custody because their removal periods had not expired and there is a "significant likelihood of removal in [the] reasonably foreseeable future." *Id.*

## ANALYSIS

Petitioners are seeking release from BTC because of the ongoing pandemic caused by COVID-19. Specifically, Petitioners are claiming their ongoing detention violates the Fifth Amendment Due Process Clause because it is excessive in relation to any legitimate governmental purpose. This, according to Petitioners, warrants the use of the Court's broad equitable powers to release Petitioners given the alleged violation of their constitutional rights. Notably, Petitioners assert that release is the *only* available remedy because the living conditions in BTC cannot be changed or adapted to comply with the recommendations provided by the CDC.

Respondents retort that this Court lacks subject matter jurisdiction and Petitioners lack standing to bring suit. However, assuming Petitioners overcome these jurisdictional thresholds, Respondents urge the Court to refrain from releasing Petitioners for several reasons. First, Respondents allege that Petitioners' detention does not amount to unlawful punishment under the Fifth Amendment and therefore, Petitioners cannot demonstrate a likelihood of success on the merits—a necessary element for injunctive relief. Second, BTC is taking all precautionary

---

[18] Because Petitioner Reyes Otero does not have a chronic medical history or any indication he is considered "high risk," he is not identified as a subclass member of the court order. However, ICE nonetheless conducted a custody determination as to Petitioner Reyes Otero.

measures possible to prevent the spread of COVID-19—including reducing its capacity, requiring all staff to wear PPE, attempting to create social distancing measures, and providing necessary medical care and educational materials to detainees—and therefore, release is not warranted. Third, Respondents claim release is not an appropriate remedy under this Court's binding precedent.  Lastly, the decision to release detainees remains with the Executive Branch—namely, the Attorney General—not the judiciary.

The Court finds it has subject matter jurisdiction under 28 U.S.C. section 1331 and Petitioners have standing to bring suit.  However, the Court will not release Petitioners because they cannot demonstrate a success of likelihood on the merits regarding their constitutional claim. The Court will address each issue in turn.

### A.  *Subject Matter Jurisdiction*

Petitioners allege subject matter jurisdiction under 28 U.S.C. section 2241.[19]  *See* Petition ¶ 15.  Section 2241 permits a district court to grant a writ of habeas corpus whenever a petitioner is in "custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. 2241(c)(3).  "Claims challenging the fact or duration of a sentence fall within the 'core' of habeas corpus, while claims challenging the conditions of confinement fall outside of habeas corpus law." *Vaz v. Skinner*, 643 F. App'x 778, 780 (11th Cir. 2015) (citing *Nelson v. Campbell*, 541 U.S. 637, 644 (2004)); *see also A.S.M. v. Donahue*, No. 20-cv-62, 2020 WL 1847158, at *1 (M.D. Ga. Apr. 10, 2020) (finding that a writ of habeas corpus was not the appropriate jurisdictional vehicle for releasing detainees due to COVID-19).

---

[19]  Petitioners also allege subject matter jurisdiction under 28 U.S.C. section 1361.  *See* Petition ¶ 15. However, section 1361 is wholly inapplicable because a mandamus action "will lie only when . . . the defendant owes the plaintiff a clear, non-discretionary duty[,]" and the decision to release detainees is a discretionary function of the Attorney General.  8 U.S.C. § 1226; 8 C.F.R. § 236.1; *Gonzalez-Corrales v. I.C.E.*, 522 F. App'x 619, 623 n.3 (11th Cir. 2013) (quoting *Heckler v. Ringer*, 466 U.S. 602, 616 (1984)) (internal quotations omitted).

Respondents claim the Court cannot consider the Petition under section 2241 because Petitioners are challenging the *conditions of their confinement* (i.e., an alleged lack of cleaning supplies and PPE, the inability to adequately social distance, etc.), not the *fact or duration* of their detention. Resp. at 12. Petitioners dispute this characterization and assert they are not contesting the conditions of their confinement; rather, Petitioners claim they are challenging their continued detention in light of the COVID-19 pandemic. Reply at 14-15. And even if they were contesting the conditions of their confinement, Petitioners ask this Court to utilize its "broad discretionary" power to consider an exception to this general principle given that release is the only meaningful remedy for the alleged constitutional violation. *Id.* at 16-17.

Here, Petitioners do not claim they are wrongfully detained under the Immigration Nationality Act ("INA"), 8 U.S.C. 1101 *et seq*., nor do they allege the duration of their detention is unlawful. Approximately half of the Petition and the Reply addresses the conditions at BTC, the likelihood of COVID-19 spreading within the detention center, and the impossibility of eliminating all potential risk of contracting COVID-19 due to purportedly inadequate conditions. Thus, it appears that Petitioners are in fact challenging the conditions of their confinement because absent those conditions, their claim would not exist. Given that Petitioners are seeking to contest the conditions of their confinement, they cannot avail themselves of a petition for writ of habeas corpus. *See A.S.M.*, 2020 WL 1847158, at *1 (citing *Vaz*, 634 F. App'x at 781) ("Although the Eleventh Circuit has not addressed the issue in a published opinion, an unpublished opinion in this Circuit has concluded that a petition for writ of habeas corpus is not the appropriate mechanism for contesting a prisoner's conditions of confinement.").[20]

---

[20] Notably, other circuits have considered whether similar petitions are appropriately decided via habeas relief. *See, e.g.*, *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *3 (E.D. Mich. Apr. 5, 2020); *Thakker v. Doll*, No. 20-cv-480, --F. Supp. 3d--, 2020 WL 1671563, at *2 (M.D. Pa. Mar. 31, 2020). However, these decisions relied on binding circuit precedent to determine habeas was a proper jurisdictional vehicle. Here, no such binding precedent exists. This decision is thus limited to cases within our circuit.

Further, the Court is unpersuaded by Petitioners' claim that an exception should be made here regarding the inapplicability of writs of habeas corpus to constitutional confinement claims because release from detention is the only meaningful remedy. As explained herein, the Court does not find that release is appropriate based on the present record. And even if it did, release from custody is not an available remedy for Petitioners' claims. *See Gomez v. United States*, 899 F.2d 1124, 1126 (11th Cir. 1990) ("The appropriate Eleventh Circuit relief from prison conditions . . . is to require the discontinuation of any improper practices . . . [it] does not include release from confinement."). Therefore, the Court declines to create a "narrow exception to the 'no habeas for constitutional confinement claims'" in this case. *A.S.M.*, 2020 WL 1847158, at *1. Concluding that a writ of habeas corpus is not the appropriate mechanism for seeking relief, the Court may not exercise jurisdiction under section 2241.

However, Petitioners also allege subject matter jurisdiction under 28 U.S.C. section 1331. Petition ¶ 15. Originally, Respondents disputed whether section 1331 conferred subject matter jurisdiction because the requested relief—release from detention—is unavailable in this circuit under *Gomez*. *See* Resp. at 13. However, during the Hearing, Respondents conceded that the requested relief would not necessarily eliminate the Court's jurisdiction under section 1331. *See* Hearing Transcript. And nonetheless, the Court finds it has subject matter jurisdiction because Petitioners' claims arise under the Fifth Amendment Due Process Clause and therefore, invoke federal question jurisdiction. *See* 28 U.S.C. § 1331.

### B. Standing

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540,

1547 (2016).  "The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Id.* (citation omitted).

"[T]he irreducible constitutional minimum of standing contains three elements": (1) an injury in fact; (2) a "causal connection between the injury and the conduct complained of"; and (3) a substantial likelihood that the injury will be "redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation and internal quotations omitted); *see also Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000).  Respondents claim Petitioners have not established a concrete injury in fact because Petitioners merely assume they will contract COVID-19 if they remain detained; an assertion, according to Respondents, that is purely hypothetical and speculative.  Resp. at 15; *see also Lujan*, 504 U.S. at 560 (noting injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical.") (citation and internal quotations omitted); *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1193-94 (11th Cir. 2009) (holding anticipated injury must occur "within some fixed period of time in the future" and "some day" intentions are insufficient).

In response, Petitioners point to the widespread and highly contagious nature of COVID-19 to establish their injury in fact.  Petitioners also deny their injury is speculative given that "it is not a matter of *if* COVID-19 will enter . . . [detention centers], but *when* it is finally detected therein."  Reply at 24 (quoting *Thakker*, 2020 WL 1671563, at *3). The Court agrees with Petitioners.  Although they may never contract COVID-19, the alleged injury is concrete enough to survive challenges to standing given the rapid spread and highly contagious nature of the virus.  Moreover, Petitioners need not wait to contract COVID-19 to demonstrate an injury in fact.  *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("We have great difficulty agreeing that prison authorities . . . may ignore a condition of confinement that is sure or very likely to cause serious

illness and needless suffering the next week or month or year . . . .  [A] remedy for unsafe conditions need not await a tragic event.").

Respondents also challenge the redressability of Petitioners' claims.  Specifically, Respondents claim Petitioners have not demonstrated how their release from BTC will redress their alleged injury—a heightened risk of contracting COVID-19—as community transmission is just as possible.  Resp. at 15-16.  Petitioners emphatically dispute this argument, claiming it is not supported by any data and is counterintuitive given the very nature of the virus.  Reply at 25.  On this point, CDC Guidelines support Petitioners' claim, finding that "incarcerated/detained populations have higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages."  *See* CDC Guidelines at 16.  This is likely due to the inherent design and operation of detention centers.  *Fraihat v. U.S. Imm. & Customs Enforcement*, No. 19-1546, ECF No. 81-11 (C.D. Cal. Mar. 24, 2020) (opining that "the design and operation of detention settings promotes the spread of communicable diseases such as COVID-19").  If released, Petitioners could theoretically reduce their risk of contracting COVID-19 by isolating themselves from the general population—an opportunity they do not have in detention.  Accordingly, the Court finds the Petitioners have adequately demonstrated redressability.

### C. Ripeness

"In addition to the textual constitutional constraints on the power of federal courts to decide cases, we also recognize important prudential limitations."  *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005).  "[T]he prudential aspect asks whether it is appropriate for this case to be litigated in a federal court by these parties at this time."  *Id.*  Thus, in some cases, "a claim may satisfy constitutional requirements, [but] prudential concerns 'counsel judicial restraint.'"  *Id.* (citation omitted).

The ripeness doctrine "protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *Dig. Properties, Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997) (citation and internal quotations omitted). It also "prevents federal courts from rendering impermissible advisory opinions . . . [and] the other branches from judicial meddling." *Nat'l Advert. Co.*, 402 F.3d at 1339. In fact, "one of the 'basic rationale[s]' for the ripeness doctrine is 'to protect the [administrative] agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Id.* (alteration in original) (citation omitted).

When determining if a case is ripe for review, the court must determine (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration." *Elend v. Basham*, 471 F.3d 1199, 1211 (11th Cir. 2006). "The fitness prong is typically concerned with questions of finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1258 (11th Cir. 2010) (citation and internal quotations omitted). "The hardship prong asks about the costs to the complaining party of delaying review until conditions for deciding the controversy are ideal." *Id.* (citation omitted).

Respondents claim this action is premature and not ripe for review because Petitioners do not currently have COVID-19 nor is there any evidence indicating Petitioners have been exposed to COVID-19.[21] Resp. at 17. Therefore, according Respondents, Petitioners "have brought this claim before any real harm exists." *Id.* Although Petitioners do not explicitly address the fitness

---

[21] Arguments regarding injury in fact often merge with challenges to ripeness. *See Elend*, 471 F.3d at 1205 ("It is the first element, injury in fact, that most often converges with ripeness. If an action for prospective relief is not ripe because the factual predicate for the injury has not fully materialized, then it generally will not contain a concrete injury requisite for standing."). Thus, although ripeness concerns raised by Respondents appear similar to their argument on lack of standing, the issues are separate and distinct. *See id.* ("Despite the conspicuous overlap of the two doctrines, we discuss standing and ripeness separately.").

and hardship considerations, they do stress the imminent and substantial risk of contracting COVID-19 while detained at BTC to establish ripeness.

Here, the fitness prong is satisfied because the facts are sufficiently developed to adjudicate Petitioners' claims under the Fifth Amendment Due Process Clause.  For example, the Court is aware of each Petitioners' age and health condition; the circumstances at BTC; and the severity of the COVID-19 pandemic.  The hardship prong is also satisfied.  Petitioners need not wait to contract COVID-19 or for an outbreak of COVID-19 to occur at BTC before bringing suit against Defendants to challenge the conditions of their confinement.  Accordingly, the Court finds Petitioners' claims are ripe for review.

### D.  Preliminary Injunction

To issue a preliminary injunction, the moving party must establish: "(1) . . . a substantial likelihood of success on the merits; (2) [an] irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest."  *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016).  "A preliminary injunction is an 'extraordinary and drastic remedy,' and [the moving party] bears the 'burden of persuasion' to clearly establish all four of these prerequisites."  *Id.* (citation omitted).  Here, the Court finds that Petitioners fail to demonstrate a substantial likelihood of success on the merits. Therefore, the Court need not discuss the other factors relevant to issuing a preliminary injunction.

### i.  Substantial Likelihood of Success on the Merits

To establish whether conditions of confinement violate the Fifth Amendment Due Process Clause, a district court must determine whether those conditions "amount to punishment of the detainee."  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).  "[W]hether a condition of . . . detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment

or whether it is incident to some legitimate government purpose." *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004).  Thus, "[a]n expressed intent to punish on the part of the detention facility officials is sufficient, but not necessary to establish unconstitutional . . . punishment." *Payne v. Ashley*, No. 15-462, 2016 WL 7650797, at *3 (N.D. Fla. Dec. 2, 2016) (quoting *Bell*, 441 U.S. at 538) (internal quotations omitted) (alterations added).  "And an intent to punish may be inferred when a condition of pretrial detention is not reasonably related to a legitimate government goal." *Magluta*, 375 F.3d at 1276 (quoting *McMillian v. Johnson*, 88 F.3d 1554, 1564 (11th Cir. 1996), *amended by*, 101 F.3d 1363 (11th Cir. 1996)) (internal quotations omitted); *see also Payne*, 2016 WL 7650797, at *3 ("First, a court must ask whether any 'legitimate goal' was served by the prison conditions.  Second, it must ask whether the conditions are 'reasonably related' to that goal.").

Here, Petitioners do not assert that Respondents are intentionally punishing them.  Rather, Petitioners claim they are subject to punishment in violation of the Fifth Amendment Due Process Clause because "[l]ess harsh measures are available to satisfy any government interest in continuing [detention]."[22]  Reply at 29.  Petitioners also allege release is the only available remedy because "overwhelming expert opinion has established that ICE cannot remediate its facilities in time to protect those detained."  *Id.* at 35.  Consequently, Petitioners request an exception to *Gomez*, where the Eleventh Circuit explicitly noted release is not the proper remedy for a constitutional confinement claim.  *Gomez*, 899 F.2d at 1126.

---

[22]  In their Reply, Petitioners raise, for the first time, arguments under the Eighth Amendment.  *See* Reply at 30-31.  However, the Petition does not allege any constitutional violations under the Eighth Amendment. *See* Petition ¶¶ 132, 138.  Therefore, the Court will not consider whether the conditions of confinement in light of COVID-19 and the Petitioners' underlying health conditions violate the Eighth Amendment.  *See Bruhl v. PriceWaterhouseCoopers Int'l*, No. 03–23044, 2007 WL 997362, at *4 (S.D. Fla. Mar. 27, 2007 (noting that a plaintiff may not supplant allegations made in their complaint with new allegations raised in a response to a motion); *accord Walker v. City of Orlando*, No. 07–651, 2007 WL 1839431, at *5 (M.D. Fla. June 26, 2007) (limiting consideration to the allegations contained in the complaint, even when new allegations were raised in response to a motion to dismiss).

Petitioners provide the Court with three declarations describing the allegedly inadequate conditions at BTC. The first declaration is from a staff attorney who toured BTC *over a year ago*. *See* Decl. Sawyeh Esmaili [ECF No. 1-11] ("Sawyeh Decl.") ¶ 6. The second declaration is from another staff attorney who visited BTC on a single day, almost *two months ago*. *See* Fabra Decl. ¶ 4. And the last declaration is from a former detainee who left BTC on April 3, 2020. *See* Rosmary Decl. ¶ 3. Each declaration focuses on different aspects of BTC. For example, the former detainee claims "the hand sanitizer dispenser in the women's wing . . . did not have hand sanitizer for at least a week during the pandemic." *Id.* at ¶ 38. Fabra states she did not witness detention officers wearing masks and noted the lack of routine COVID-19 testing. Fabra Decl. ¶¶ 5, 10, 13. And Sawyeh (and Fabra) recognized the limited space at BTC and stated detainees were housed in rooms with three bunk beds (up to six roommates) and shared a communal bathroom. Sawyeh Decl. ¶ 14; Fabra Decl. ¶ 12. This, coupled with the severity and highly contagious nature of COVID-19 and Petitioners' underlying health conditions, is allegedly sufficient to demonstrate that Respondents are punishing Petitioners by keeping them detained.

Respondents posit that Petitioners' claims fail because they have not demonstrated their confinement during the COVID-19 pandemic is not rationally related to a legitimate government goal. Resp. at 18-19. Alternatively, Respondents also assert that even if a constitutional violation exists, *Gomez* forecloses Petitioners' requested relief. *Id.* at 20. As of April 29, 2020, Respondents have provided two declarations evidencing the significant efforts BTC has taken to comply with ICE Guidelines and nationwide court orders to ensure the safety of not only detainees, but also detention officers, medical personnel, and other staff. These efforts include reducing BTC's capacity by almost 40 percent, allowing personnel to telework whenever possible, suspending all visitation, limiting the number of people in the cafeteria, providing access to medical care and educational materials, and cohorting new intakes.

After considering the evidence presented, the Court finds that Petitioners have not demonstrated a substantial likelihood of success on the merits. First, it is a fallacy to think that Respondents do not have a legitimate government purpose in "preventing detained aliens from absconding and ensuring that they appear for removal." *Dawson*, 2020 WL 1304557, at *2 (citing *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018); *Demore v. Kim*, 538 U.S. 510, 523 (2003); *Zadvydas v. Davis*, 533 U.S. 678, 690-91 (2001)). Thus, the remaining question is whether continued detention in light of the COVID-19 pandemic is reasonably related to that goal.

Detention comes with its flaws. Even *without* a highly contagious pandemic, there is always an unfortunate risk that detainees will be exposed to certain communicable diseases, such as the common cold or tuberculosis. This is due in obvious part to limited space, overpopulation, and lack of resources. But these shortcomings do not automatically translate into a constitutional violation. The relevant inquiry here is whether the nature of detention in BTC passes constitutional muster. And a review of the record answers this question in the affirmative. Respondents have made conscious efforts to create a safe environment for the detainees and BTC's staff, despite inherent obstacles and the novel COVID-19 virus. Although these efforts are not perfect, they remedy what is practically possible and constitutionally required without overhauling the entire nature of confinement.

Additionally, each Petitioner has a final order of removal and each Petitioner is expected to be deported within the month. With the exception of one Petitioner, each were denied bond pending removal proceedings, and the Petitioner given bond was detained as part of a fugitive operation. In light of these circumstances, the Court finds detainment is reasonably related to the Respondent's legitimate purpose. Accordingly, the Court does not find Petitioners' continued detention amounts to punishment under the Fifth Amendment Due Process Clause.

Moreover, even if Petitioners' ongoing detention violated the Fifth Amendment, they would not be entitled to the requested relief because it is unavailable in this circuit.[23] *See Gomez*, 899 F.2d at 1125-26 ("The appropriate Eleventh Circuit relief from prison conditions that violate the [Constitution] during legal incarceration is to require the discontinuance of any improper practices[,] . . . [it] does not include release from confinement."); *see also Vaz*, 634 F. App'x at 781 ("[E]ven if [p]etitioner established a constitutional violation, he would not be entitled to the relief he seeks because release from imprisonment is not an available remedy for a conditions-of-confinement claim."). Petitioners ask this Court to consider an exception to *Gomez* for two reasons: (1) release is the only available remedy; and (2) this pandemic is an extraordinary circumstance not anticipated by the *Gomez* Court. *See* Reply at 18-19, 31; Hearing Transcript.

Although the Court is sympathetic to Petitioners' argument, it does not find an exception to *Gomez* is warranted in this case. Simply put, the Court is not persuaded that release is the only available remedy for Petitioners. Theoretically, Respondents can continue periodically evaluating detainees and releasing individuals as they see fit. Respondents could provide masks to every detainee, hire professional cleaning services, and staff more doctors at BTC. All of these hypothetical changes could dramatically reduce the risk of transmitting and spreading COVID-19 at BTC. Further, Petitioners do not cite any case law permitting a district court to deviate from binding precedent when faced with emergency circumstances. The Court must yield to the parameters established by the Eleventh Circuit.

The Court also agrees with Respondents' contention that absent a constitutional violation, the decision to release Petitioners—or implement "less harsh measures"—remains with the Attorney General, not the judiciary. *See* Hearing Transcript. When implementing the INA,

---

[23] At the Hearing, the Court asked Petitioners whether any relief short of release would be appropriate. Petitioners maintained that the alleged constitutional violations can only be remedied by release from detention. *See* Hearing Transcript.

Congress delegated certain duties to the Attorney General including "the authority to allow deportable aliens to remain in this country in certain specified circumstances," such as providing for interim release or relief from removal. *See I.N.S. v. Chadha*, 462 U.S. 919, 954-55 (1983). Because of this, the Executive Branch is tasked with the enforcement of immigration law, and immigration officials are given "broad discretion" in the exercise of their power—especially when it comes to the removal system. *Arizona v. United States*, 567 U.S. 387, 396-97 (2016). And "as a result of the existence of inherent executive power over immigration and the broad delegations of discretionary authority in the INA, the separation-of-powers doctrine places few restrictions on executive officials in dealing with aliens who come to this country in search of admission." *Jean v. Nelson*, 727 F.2d 957, 967 (11th Cir. 1984). Thus, judicial review of these discretionary decisions "must take appropriate account of the greater immigration-related expertise of the Executive Branch . . . and the Nation's need to 'speak with one voice' in immigration matters." *Zadvydas*, 533 U.S. at 701.

Ultimately, this case involves a determination reserved for the Attorney General who can adequately review the immigration, health, and criminal records of each detainee at every detention center and make reasonably informed decisions as to who may be released. Respondents are best suited to decide who amongst the detained population at BTC merits release due to a heightened risk of contracting COVID-19. The judiciary is ill-equipped to determine whether Petitioners in this action are more deserving of release than their detained neighbors. Nor is the judiciary prepared to strip an administrative agency of their discretionary decisions.

### ii.  *Gayle v. Meade*

The Court is acutely aware that in reaching its conclusion, it is somewhat at odds with the determinations made by a sister court in this district. *See generally Gayle v. Meade*, No. 20-21553, 2020 WL 2086482 (S.D. Fla. Apr. 30, 2020) (Cooke, J.). In *Gayle*, the district court considered a

similar petition requesting release of several detainees from three facilities, including BTC, in light of COVID-19. *Id.* at *2. In applying the Eighth Amendment in lieu of the Fifth Amendment,[24] the district court found the government acted with deliberate indifference as to the safety and well-being of the detainees at these facilities. *Id.* at *4.

In reaching this determination, the court noted the conditions in the Krome Detention Facility were "becoming worse every day" in part due to confirmed cases of COVID-19 within the facility, while the bunk beds and seating in the cafeteria at the Glades County Detention Center were not adequately spaced apart to promote social distancing. *Id.* at *4, 6. However, the district court pointed to BTC's decrease in population as an example of a "conscious effort to address detention conditions in light of COVID-19." *Id.* at *4. Moreover, the majority of the court's findings were moot as to BTC.[25] For example, the court instructed ICE to submit a report indicating how it intends to reduce the population to 75% capacity at each of the detention centers. *Id.* at *7. However, BTC is already at 63% capacity. *See* Suppl. Lopez Vega Decl. ¶ 14. The court also instructed ICE to evaluate the petitioners in light of their "current health status, eligibility for bond, immigration status, immigration court history . . . and prior criminal history." *Gayle*, 2020 WL 2086482, at *7. But Respondents have already re-considered each Petitioner in this action and taken into account such factors in determining the need for continued detention. *See* Suppl. Lopez Vega Decl. ¶¶ 25, 28, 32, 34.

Additionally, the *Gayle* Court awarded a preliminary injunction in part because it found the government violated CDC guidelines and by extension, its own guidelines. *See Gayle*, 2020

---

[24] The district court recognized the "limitations imposed by the Eighth Amendment and the Due Process Clause." *Gayle*, 2020 WL 2086482, at *3 n.10. "However, with respect to the provision of medical care and supervision to individuals in the state's custody," the court noted that the "the two provisions necessarily yield the same result." *Id.*

[25] The only mandate arguably applicable to BTC was requiring ICE to provide all detainees with masks. *Gayle*, 2020 WL 2086482, at *7. *But see* Reply at 10 ("*Until very recently*, masks and gloves have not been provided to the detained population.") (emphasis added).

WL 2086482, at *5-6.  However, this Court respectfully disagrees.  The *Gayle* Court noted that ICE violated its own guidelines by failing to space beds six feet apart in all directions.  However, the relevant ICE Guidelines do not *require* detention facilities to provide sleeping arrangements with six feet of separation; in fact, the ICE Guidelines only reference maintaining a six-foot distance as part of its recommendation for staff coming into contact with an individual who appears feverish or ill.  *See* ICE Guidelines at 13 ("When *feasible and consistent* with security priorities, encourage staff to maintain a distance greater than six feet from an individual who appears feverish or ill . . . .") (emphasis added).  Further, CDC Guidelines also do not *require* detention centers to house inmates six feet apart.  *See* CDC Guidelines at 11 ("*If space allows*, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions.") (emphasis added).  Therefore, Respondents have not failed to abide by their own guidelines.

## CONCLUSION

The importance of protecting detainee and essential personnel in the midst of the ongoing COVID-19 pandemic cannot be understated.  But as long as detention facilities meet their responsibilities in accordance with protections afforded by the Constitution, they must be free to manage the release of those most vulnerable to this virus.  Thus, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. The Petition [ECF No. 1] is **DENIED**.

2. Because the requested relief is limited to release, this action is **DISMISSED**.

3. Any pending motions are **DENIED AS MOOT**.

4. The Clerk is instructed to **CLOSE** this case.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 6th day of May, 2020.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**